UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THOMAS FEELEY AND DIANE FEELEY, Plaintiffs, v. VIAD Corp for Griscom-Russell, et al., Defendants. | CIVIL ACTION NO. (Rhode Island Superior Court, Providence County, C.A. No.: PC 08-0836) |

**DECLARATION OF REAR ADMIRAL (USN, RETIRED) BEN J. LEHMAN**

I, Ben J. Lehman, under penalty of perjury and of my own personal knowledge, state the following:

1. I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Mechanical Engineering degree from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design at the Naval Academy in Annapolis. The curriculum was primarily in electrical and mechanical engineering. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University.

I joined the United States Navy in 1942 and remained on active duty until 1946. While on active duty in the United States Navy, I served as Ship Superintendent and Dry Docking Officer at the Brooklyn Navy Yard between 1942 and 1944.

In 1946, I left active duty and joined the Naval Reserve. In 1950, I returned to active duty and was assigned as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952. I was then transferred to the Assistant Industrial Manager Office in San Francisco from 1952 to 1954 as a Planning Officer.

In 1954, I returned to the Naval Reserve where I was a member and then Commanding Officer of Naval Reserve Engineering Companies.

I was promoted to Rear Admiral in 1977 in the Naval Reserve.

I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods, I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975 providing engineering consultation services to various industries including the shipbuilding industry. During my Naval service, I have personally been responsible for the creation of Navy specifications for the procurement of materials and machinery for use on Navy ships. A true, complete and accurate copy of my Curriculum Vitae is attached as Exhibit 1.

2. Based on my experience, professional training and education, I am familiar with the plans, designs and specifications used in the construction and repair of commercial and Navy ships. In addition, I am familiar with Navy specifications, equipment manuals and qualified products lists which are used in the construction and repair of Navy and commercial ships. I am also familiar with the Navy regulations regarding the use, placement and repairs or maintenance of asbestos products generally during the periods in which they were used and the Navy regulations regarding such maintenance, technical manuals and warnings permitted by the Navy.

3. I submit this Declaration to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design, manufacture and use of equipment intended for installation on Navy vessels.

4. During my service in the Navy as a Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard) and at the San Francisco Naval Shipyard (Hunter's Point).

5. During the 1940s and 1950s, the Navy generally utilized a system of ship design and construction that established and set the designs of ships, which designs were known to the Navy to meet particular performance capabilities. The Navy then restricted any deviations from such designs by any suppliers and/or contractors. When a change in the design and/or construction of a ship was required, the Navy would oversee, control and approve all aspects of the change. Design drawings were prepared by the design agent for the Navy or by the Navy itself. The Navy reviewed and approved the drawings and then submitted them to the individual suppliers and contractors to use in the manufacturing, supply and/or installation of the equipment and the construction of the ship. These pertained to the original designs, as well as changes initiated and controlled by the Navy.

6. I have reviewed various documents submitted by Buffalo Pumps in connection with its removal and related briefing in William A. O'Connell v. Foster Wheeler Energy Corp., et al., Civil Action No. 08-10078-RGS (D. Mass). As an aid to the Court, I submit herewith as Exhibit 2 an affidavit of Navy Rear Admiral David Sargent, Jr., and also the documents attached as Exhibit L to the Sargent affidavit; and I submit herewith as Exhibit 3 an affidavit of Buffalo Pumps' production manager Martin Kraft, and also the documents attached as Exhibit C to the

Kraft affidavit. I have read both affidavits, including these exhibits, and am familiar with their content. Based upon my personal experience, these documents attached to both affidavits are typical of the Navy's detailed attention to and control over the content of submissions, and the type of correspondence that the Navy used to reject submissions of, and to require corrections and resubmissions by, its various contractors. In my experience, such preliminary drafts and responsive comments were more typically discarded than retained, which may serve to explain why more such documents have not turned up.

7. Any deviation from military specifications of equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other item of equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew in maintaining the ship during its service using materials carried on board when shipyard help was not available.

8. In the 1940s, 1950s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel were approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

9. The Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation by any of its contractors.

10. The Navy specified the use and placement of insulation, including asbestos insulation, on Navy ships during World War II and the 1950s. Mechanical equipment for use aboard Navy ships was delivered without insulation. This was to prevent damage to the insulation during shipment and installation, and to allow the equipment to be effectively connected to other equipment and systems on board, which connections as well as the equipment could then be effectively insulated. If mechanical equipment such as fuel oil heaters and evaporators were to be insulated, it was not insulated by the manufacturers, but rather by shipyard personnel.

Shipyards and shipyard personnel were solely responsible for installing and insulating the equipment. Insulation was installed in accordance with plans, specifications, and schedules developed for and controlled by the Navy. Based upon my experience, professional training, education and research, it is my opinion that the United States Navy was aware of the dangers of asbestos by the 1940s. Despite such knowledge, the Navy did not provide any warnings. The research by LCdr S. A. Forman, MC, U.S. Navy [Par. 13g, below] supports my opinion.

11. Based upon my experience, professional training, education and research, it is my opinion that equipment suppliers were prohibited from providing any warnings to be placed on or to accompany equipment supplied to the Navy without the consent and approval of the Navy. Moreover, certain types of warnings would not have been approved by the Navy given the necessary performance needs and capabilities of the shipboard equipment, the ships and Navy personnel. This would have included, but not been limited to, any potential warnings associated with asbestos including, but not limited to, recommendations regarding respiratory protection, and repair and maintenance practices. This was due to the inability to effectively and comprehensively observe, implement, and comply with such recommendations under the multitude of varying conditions likely to be encountered by Navy ships at sea, and especially at war.

All equipment and procedures had to be standardized to ensure that personnel were familiar with the procedures for operating, repairing and maintaining the equipment, and that the tools and equipment aboard ship or at ports world-wide were available to perform such procedures. Thus, a contractor or supplier could not provide warnings or recommendations without the consent and authorization of the Navy.

12. During the 1940s and early 1950s, the Navy did not have the tools, equipment and/or personnel capabilities to meet or comply with any potential warnings or recommendations pertaining to the health hazards of asbestos aboard ship, especially under the exigencies of war. Further, the Navy limited the areas of interest of each manufacturer to the equipment supplied by that manufacturer. Because equipment was required by the Navy to be supplied without insulation, it would have been improper and unauthorized for the manufacturer or supplier of such equipment to supply warnings or other recommendations with respect to insulation, which

would not have been within its particular area of interest. As the manufacturer and/or supplier would not have been responsible for the insulation, it likely would not have been aware of any hazard associated with such insulation or required to determine whether any existed, and thus it had no ability or obligation to supply warnings about insulation. As the Navy would have been the entity that required the insulation, designated the type and placement of the insulation, and directed a different entity to supply, install it, or both e.g., the shipyard, the Navy's knowledge of any potential hazards associated with the insulation would have been equal or superior to that of the equipment manufacturers and suppliers that provided the uninsulated equipment, such as heaters and evaporators.

13. Based upon my review of many documents regarding the Navy's hazard communication program, my career experience in the Navy, and personal knowledge of the Navy's hazard communication program and naval practices generally, I can state as follows:

a. Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy could simply not operate if various personnel were trained differently and received additional inconsistent information from different manufacturers.

b. Asbestos insulation products began containing hazard warning labels from the insulation manufacturers in the mid-1960s. Prior to that time, beginning more than two decades earlier, the Navy's own occupational health program provided training, engineering and administrative controls, personal protective equipment, and medical surveillance to prevent the hazards of asbestos to shipyard workers.

c. Any additional warning about the hazards of asbestos by an equipment manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete, and almost certainly inconsistent with the Navy's own training. The Navy could not permit unauthorized hazard labels which might interfere with the abilities of sailors to perform their duties in the heat of battle.

d. At most, it is possible that manufacturers of equipment delivered to the Navy without insulation (such as heaters and evaporators equipment) could merely have told personnel to follow the Navy's own mandates for handling asbestos. This redundant information is not informative, diverts attention from hazards inherent in the equipment, and would certainly become obsolete. Heaters and evaporators last many years and the Navy's asbestos hazard communication program evolved over the years to keep pace with scientific developments and changes in materials.

e. If each equipment manufacturer (and conceivably even the pipe and structural steel manufacturers) provided its own warning about asbestos insulation that might be used on or around its product, inconsistent warnings would certainly have resulted. Many other hazardous substances (for example boiler feed water chemicals, fuels, solvents, heavy metals) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on myriad substances.

f. Some types of insulation used by the Navy on equipment were non-asbestos (e.g., fiberglass blankets) and any general warning about asbestos on

such equipment would simply be wrong. In fact, asbestos was designated as a "critical material" by the Army and Navy Munitions Board on or about January 30, 1940. See Exhibit 4. The Navy directed that substitutes for asbestos, including fiberglass, cotton duck lagging and hair felt, should be used where possible, including on low temperature pieces of equipment such as evaporators and heaters, in order to conserve available asbestos. See Exhibit 5.

g. Based on my experience, the United States Navy, as the biggest user of asbestos in World War II, and thereafter in shipbuilding, was more knowledgeable about any hazard of asbestos than any of the vendors who supplied it and upon whom plaintiff seeks to impose a duty not consistent with or imposed by the above naval specification. In Par. 10, I mentioned the extent of the Navy's knowledge with regard to asbestos. As an aid to the Court, I submit herewith as Exhibit 6 an affidavit of Samuel A. Forman, M.D., with attached exhibits, with which I am thoroughly familiar from various other litigations involving the U.S. Navy. Dr. Forman compiled the documents attached to his affidavit while detailed by the Navy and under Navy orders to perform an investigation into the state of Naval hygiene and asbestos. I agree with the conclusion of Dr. Forman that the state of knowledge of the United States Navy regarding hazards of asbestos was quite complete when compared to available knowledge at the time of World War II, and that by 1940, the United States Navy was a leader in the field of occupational medicine relating to, among other things, asbestos exposure. I myself, was exposed to asbestos in inspecting the work of insulating shops under my supervision during my tenure at the Brooklyn Navy

Yard and also in San Francisco. Accordingly, my interest in the Navy's knowledge in this field was both personal and professional, and continuing to this day.

I have reviewed all of the exhibits attached to the affidavit of Dr. Forman including the article attached as Exhibit C thereto, as well as the documents listed above in sub-paragraph (f), which I saw in the course of my duties as a naval officer, as either official United States Navy Documents or articles reproduced from recognized and reputable magazines and reviews of the kind relied upon by experts.

14. Based on my experience, the United States Navy is bound by its own regulations and would not permit any vendor gratuitously to do anything not provided for in its own regulations. The Navy would not allow any warnings to be placed on any product without specific authority by way of an order or a regulation.

Therefore, I conclude:

The information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, represented the state-of-the-art and far exceeded any information that possibly could have been provided by manufacturers of equipment like heaters and evaporators. Based upon the knowledge at a given period in time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust program to control exposure of personnel and monitor their health.

There was no information concerning any asbestos hazard or danger posed by any asbestos-containing product applied to any equipment on a United States Navy ship known to a

manufacturer of equipment such as heaters and evaporators, that was not previously known to the United States and the United States Navy.

It would be unreasonable to assume that the Navy would have accepted gratuitous comments from equipment manufacturers about hazards associated with a product they neither made nor sold and about which the Navy was already aware.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of May, 2008.

Ben J. Lehman
Rear Admiral