*William A. O'Connell v. Buffalo Pumps, Inc. et al.,*
**Civil Action 1:08-cv-10078-RGS,**
**United States District Court, District of Massachusetts**

**AFFIDAVIT OF DAVID P. SARGENT, JR.**

**STATE OF HAWAII )**
**) SS.**
**CITY AND COUNTY OF HONOLULU )**

DAVID P. SARGENT, JR., being duly sworn, deposes and states under the penalties of perjury, as follows:

**Background and Experience**

1. I am a retired Rear Admiral of the United States Navy, in which I served between 1967 and 1999. I began my active naval career in 1967 after receiving a Bachelor of Science degree in Mechanical Engineering from Cornell University and receiving a commission in the Navy through the Naval ROTC program. Upon commissioning in the Navy, I attended the Cruiser-Destroyer Forces Pacific Fleet Engineering Officer's School in a course focused on the operation and maintenance of engineering plants of World War II era warships. In 1974, I received a Master of Mechanical Engineering degree from the Naval Postgraduate School, Monterey, California. In addition, I am a licensed Professional Engineer (Mechanical) with extensive operational experience in ship engineering, ship maintenance and at-sea operations.

2. My assignments from 1967 until 1988 were primarily involved with the operation and maintenance of Navy warships. Thereafter, I held a variety of program and technical management positions in the Naval Sea Systems Command program offices

where I was responsible for the design, construction, fleet introduction, in-service support, and modernization of various classes of warships. Upon selection to Rear Admiral in 1994, I was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations responsible for research and development of all technical aspects of Navy surface ships and submarines. My final assignment before retirement in 1999 was as Program Executive Officer for Aircraft Carriers, Expeditionary Warfare and Auxiliary ships. In that position, I had overall responsibility for all matters relating to both the technical and programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare and auxiliary ships of the Navy.

3. I am now President of Sargent Enterprises, Inc., which includes two companies serving the maritime industries. SEI Associates, an engineering services business, provides technical and management support to maritime industries. SEI Marine Technologies is a company that operates and maintains various test and demonstration craft for research and development companies involved in developing new equipments and hull forms for future high performance ships. I have served for many years in active leadership of the American Society of Naval Engineers, and in 2001 and again in 2003 was elected to serve two consecutive two-year terms as president of that organization. I am also a member of the Sigma Xi Engineering Honorary Society, the American Society of Mechanical Engineers and the Cornell Engineering Alumni. Association.

4. As a Navy engineering officer and program manager, I was often called upon to assist in determining conformance of shipbuilders and equipment vendors to drawings and specifications prior to acceptance by the Navy. The chain of command within the

Navy concerning ship design and construction involves several layers of authority, particularly in the lines of command for technical and contractual control over Navy ship design, construction, maintenance and repair. Ultimately, the Secretary of the Navy has authority over the Navy including Navy shipbuilding design, construction and operation. During the 1940s, 1950s and 1960s, the Navy Bureau of Ships (BUSHIPS) (later known as NAVSHIPS and currently as NAVSEA) controlled all Navy ship design and construction.

5. I am knowledgeable from my own Navy service, and also from my education, training, research and experience with the historical practices and procedures employed by the Navy in the design and construction of vessels and the operation of its vessels and facilities.

**Navy Warships are Unique and Complex**

6. Warships must be designed to meet very demanding performance requirements such as high speed and firing of weapons, the ability to safely carry and employ a vast array of explosives and ammunition, the ability to operate for long periods at sea without support or replenishment, and do all these missions both in peacetime and in combat.

7. Navy warships are some of the most complex machines ever designed and constructed. They are high-speed, floating, heavily armed communitites that must support hundreds of crew members and a vast array of complex systems for months at sea. Ships are the only machines sufficiently large, complex and mobile that the operators must live inside the machines they operate. Thus, warships of all sizes and types contain all the facilities of a community plus multiple the armaments and ammunition. Major characteristics and capabilities include a sturdy and survivable hull

form, high performance propulsion systems, electrical power generation to support all needs, fresh water distilling systems, food storage, preparation, and eating spaces as well as clean up, living spaces, laundry services, medical spaces, library, firefighting and damage control capabilities, and many other services.

8. An example will help to illustrate the immense task faced by the Navy in designing warships. Among the vessels constructed by the Navy during the general period in question were the so-called *Forrestal* class aircraft carriers. These ships were designed and constructed during the 1950s and served the Navy into the 1990s.

9. The *Forrestal* class carriers were 1,063 feet long, with an extreme width of 252 feet. They displaced about 80,000 tons. Their draft, or depth below the waterline, was approximately 37 feet (about the height of a 4 story building). The overall height of the ships was greater than the height of a 25 story building, and they had 19 different "levels" or floors. The flight deck from which aircraft took off and landed was approximately four acres in size, and the hangar bay consumed an additional two acres. The vessels had approximately 3,000 separate compartments or rooms, ranging in size from small offices to engineering spaces the size of gymnasiums. The onboard storerooms were equal in size to a six-story building. It took about 300,000 gallons of paint to paint the entire ship. There were multiple large food preparation and serving areas to feed the crew around the clock.

10. The *Forrestal* class carriers were capable of speeds in excess of 30 knots (about 36 mph), produced more than 200,000 gallons of fresh water a day by distilling salt water, and carried several hundred-thousand gallons of ship and aviation fuel. Each had eight large turbo-generators that produced enough electricity to power a good sized

city. The Navy estimates that the ships had more than 10,000 miles of electrical cable installed and many miles of piping. The ships carried more than 80 aircraft each, and they had crews of more than 5,500.

11. Navy warships must be designed to operate effectively in very harsh and hostile environments, to survive battle damage and fight again, and to meet demanding speed and maneuvering requirements. Over time, the specific types of enemies, weapons and combat which Navy ships must face has changed, from a focus on surface-to-surface combat involving heavy guns to greater use of aircraft and missiles. These changes have created fundamental changes in the design and construction of Navy vessels.

12. Beginning in and following World War II, the aircraft carrier became the most significant type of surface ship. An aircraft carrier must use high speed to create wind over the deck to launch and recover aircraft. The result was an overall increase in the speed demanded of Navy vessels of all types, whether carriers or the support and escort vessels that accompany them. To meet these demands, Navy designers had to develop significantly higher horsepower propulsion plants. It was also imperative that this increased power be achieved without significant increase in either the size or the weight of the propulsion plant, since increased size and weight would require even more horsepower.

13. The unique aspects of Navy warship design and development placed other requirements on the Navy establishment. Since there was no U.S. industry that either designed or assembled these high performance propulsion plants, the Navy had to undertake itself the design of these complex and state-of-the-art warships, and had to develop ways to verify the performance and reliability of these new designs. To

accomplish this, the Navy maintained an engineering establishment with many different engineering specialties. The Navy had the most diverse and advanced engineering workforce in the nation. Additionally, verifying the performance of these new propulsion designs required that the Navy engineering organization build large shore-based laboratories in which they assembled and operated prototypes of these propulsion plants. These prototypes served many uses including verifying performance, validating reliability, and developing optimum operating procedures.

**Navy Vessels – Concept to Operational – The Process**

Cost and Feasibility Studies

14. Prior to the 1940s through the 1970s and even today, the design of a Navy warship started with the establishment of naval war fighting requirements at the national level. Examples included requirements such as the need to ensure that sea lanes in international waters could not be denied by an enemy, the need to detect and neutralize hostile ships, submarines, and aircraft that might threaten U.S. or allied coasts, the need to transport and operate aircraft near enemy territory, and the need to transport and debark Marines anywhere in the world. From requirements such as these, various ship concepts were formulated.

15. Rigorous feasibility studies were done on these concepts by both seasoned naval operators and by experienced ship engineers and designers to validate and mature the concepts, and to develop initial cost estimates for budgeting and congressional funding requests. A final ship concept design emerged, describing such parameters as approximate physical size and displacement of the ship, what weapons and sensors would be used aboard, what speed it was required to achieve, what range it must be able to

achieve without refueling, and how long it must operate at sea without replenishment. Typically, it took a year or more to progress from a defined new warship requirement set to an agreed to concept design to meet those requirements.

Preliminary Design

16. The next step in the creation of a new warship during the time periods in question was the conversion of the concept design into a preliminary design package that contained sufficient details of the structure and all ships systems to allow engineers to verify that the ship would meet established requirements. During preliminary design Navy engineers determined all equipment arrangements, the weight and stability of the ship, a detailed understanding of the ship's displacement and powering requirements, and a much better cost estimate. Work included investigation of details such as identification of what materials and technologies existed or could be developed in time to achieve the performance of each system, and ensuring that these technologies and design details could in fact be manufactured and integrated into a completed warship were considered and addressed.

17. The preliminary design phase was accomplished by dividing the very complex ship into many groupings and sub-groupings such as hull design, propulsion, electrical, deck equipment, messing and berthing, medical, navigation, weapons, sensors, and auxiliary systems to name just a few. During this preliminary design phase, engineers had to develop and document the performance, configuration, and location of each system and piece of equipment that is required to meet the overall ship performance requirements.

18. The preliminary design also had to comply fully with extensive Navy warship

design General Specifications and other design guidance developed over many decades of experience. Examples include aspects such as how much damage the ship must be able to experience and still remain operable, what levels of shock from battle damage equipment must withstand and remain operational, and what fire fighting and damage control capabilities must be included in the design. At the completion of the preliminary design and related documentation, the Navy was confident that the ship and all included systems and equipments would function as designed and would meet the war fighting requirements.

19. Although the time to develop a preliminary design varied greatly depending on the size and complexity of the warship, typically for a destroyer-type warship, the preliminary design required six months to a year and thousands of man-years of engineering work.

<u>Development of the Contract Design package</u>:

20. The next phase in progressing from a ship design to an operational warship was the contract design process, in which the preliminary designs were converted into documentation of proper format and sufficient details for use in the government acquisition contracting process. In essence, this effort was to "design" the procurement contract.

21. The complex ship systems and subsystems described in the preliminary design were typically comprised of a myriad of individual mechanical and electrical components connected together in intricate ways. During the contract design phase, Navy engineers had to confirm that sources existed from which the specified materials, equipments, and consumables could be obtained. However, usually there was no one

source from which the Navy could obtain these complex warship systems and subsystems. Rather, sources had to be identified for individual components that could later be assembled into the Navy's complete systems. Thus, the Navy typically had to procure, for each vessel, countless individual components from dozens of individual suppliers and sources. Examples of components associated with just the propulsion systems on Navy warships include specific types of steel and fasteners, pipe and fittings; pumps, valves, turbines, condensers; electrical motors, generators, and switchboards; gauges, meters, alarms; boilers, condensers and reduction gears. During World War II and well into the 1960s, virtually all equipment that was to be installed in warships was procured by the Navy and provided to the building shipyard as government-furnished equipment.

22. This detailed design of all equipment, subsystems, systems, and the entire ship also was required to comply fully with a plethora of Navy design guidance developed from previous experience. For example, the Navy sets and follows internal standards and requirements regarding such matters as levels of redundancy necessary to preclude single points of failure, standardization of consumables and spare parts amongst different equipments, systems and with other warship classes, crew operating environmental requirements such as temperature, noise, lighting, equipment labeling, standard Navy identification and labeling of decks, doorways, compartments, and equipment, and housekeeping matters such as heating and ventilation, food storage preparation and serving, and laundry requirements.

23. The contract design package when complete included the entire set of Ship Specifications with detailed design information, the contract plan for procuring all

equipment as well as contracting for ship construction, and the multitude of individual requests for proposals that were required to describe every piece of material, equipment and subsystem that had to be procured to allow construction of the warship. The development of the contract design package involved multiple government decisions. Examples include decisions which were subject to various Navy and other federal guidance and regulations, such as Federal Specifications, Federal Acquisition Regulations and Defense Federal Acquisition Regulations.

24. The Navy developed specifications called, since the 1950s, Military Specifications (MILSPECs) for use in the contract design package. Thousands of MILSPECs were developed for various specific materials, equipment, components, books, manuals, label plates, etc. These MILSPECs presented very detailed descriptions of what the government required when procuring the items covered by the MILSPECs, including requirements such as chemical composition, dimensions, required testing and performance demonstrations, required labeling, packaging and shipping requirements, and similar content. These specifications typically cross-referenced and invoked other specifications.

25. The Navy maintained the responsibility to develop the MILSPECs and other standards for the manufacture and supply of equipment used in the construction, maintenance and repair of Navy ships. Specifications for any equipment intended for use aboard Navy ships were drafted, approved and maintained by the Navy. Once promulgated, only the Navy could make changes or modifications to those specifications. MILSPECs were prepared by hundreds of Navy engineers highly qualified in specialty areas such as, among many other things, pumps, steam turbines, gas turbines, reduction

gears, ship propulsion, and auxiliary equipment.

26. This specification system was initiated in the 1930s and was expanded in both scope and detail for use in the procurement of the large number of complex warships procured in the World War II timeframe and since. The technical specifications system always included a disciplined revision and change process to ensure technical specifications were kept current and reflected changing requirements, technology, materials, and other related updates. Manufacturers of components, such as pumps, procured by the Navy for use in warships were required to comply with technical specifications in all details in order for the Navy to accept the equipments being manufactured, tested, and shipped.

27. Examples of MILSPECs issued by the Navy for centrifugal pumps of the type manufactured by Buffalo Pumps are attached as Exhibits A and B. Notably, among numerous other detailed requirements, both required that internal gaskets in the pumps be "asbestos sheet gaskets."

28. Navy specifications were communicated to vendors such as Buffalo Pumps when the Navy (or private entities, such as shipyards or professional design firms) issued Requests for Proposal (formerly called Invitations for Bid) for the manufacture or supply of certain equipment. Compliance with the standards and specifications issued for equipment supplied for ultimate use aboard Navy ships was directly monitored by Naval Machinery Inspectors under both of the following divisions: (a) Machinery Inspectors under the Bureau of Supplies and Accounts worked on-site at vendor facilities, such as Buffalo Pumps' manufacturing facility; and (b) Machinery Inspectors under BUSHIPS carried out their responsibilities at the shipbuilding yards. The Machinery Inspectors

ultimately worked for the Secretary of the Navy or the Secretary of War. These Inspectors exercised primary, front line control and direction over the work performed for the Navy by original equipment manufacturers, regardless of whether the equipment was being constructed or supplied pursuant to a Navy or private contract. Buffalo Pumps equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications.'

29. The incredible level of detail contained in these specifications is necessary to ensure complete and common understanding between the government and vendors of what it is the government requires and is committing to pay for, to ensure commonality across systems with similar components, and to ensure that replacement parts, equipment and consumable materials, some provided by different manufacturers, will all perform as desired. An acquisition contract typically invokes many different MILSPECs and various technical documents such as drawings prepared by the Navy's Bureau of Ships. Taken together, the contract and the incorporated materials present all details of what the Navy requires. It is through this detailed acquisition process that misunderstanding, or rejection at the time of government acceptance inspection, is avoided. This process also minimizes contract disputes between the government and industry vendors.

30. Developing the contract design package is comparable to the effort required if a team was to simultaneously develop the detailed designs and contracts to construct a small city including all the required services such as utilities, hospitals, restaurants, and the like. Because of the complexity and thoroughness required, development of the contract design package for a warship such as a destroyer typically took two years or more to complete, with thousands of man-years or effort from engineers, logisticians,

contract and legal specialists.

Detailed Design

31. From the 1940s through the 1970s,and even tosay, the next step in the creation of a new warship was the conversion of the contract design into detailed design package that contains sufficient details of the structure and all ships systems to allow the building shipyard to build the ship and integrate all specified equipment in accordance with Navy requirements and specifications. The detailed design was typically accomplished by the construction shipyard – whether a Navy yard or a private yard – after the construction contract was awarded. During this detailed design phase, engineers had to develop and document in detail the exact location, mounting details, and interface details of each system and piece of equipment in the total ship. Even where not performed by Navy personnel, the detailed design was also overseen by Navy representatives.

Warship Construction

32. The final phases in getting the warship operational included the construction, testing and trials, and acceptance by the Navy. During World War II and up until the mid-1960s, some Navy warships were constructed at Naval Shipyards and others were constructed at private shipyards under Navy contract and supervision. Once the Navy selected a construction shipyard, that shipyard was required to comply with all details of the contract in the procurement of material and equipment, the construction of the ship, the testing of equipment, subsystems, and systems and the demonstration to the government that all systems functioned properly. All construction and testing was overseen on a daily basis by the on-site Navy Supervisor of Shipbuilding team. Formal

acceptance of the completed warship was recommended by the Navy Board of Inspection and Survey only after the members of the Board had witnessed successful sea trials of all systems.

33. Construction of even a relatively small warship such as a destroyer typically took three to five years, with larger ships requiring somewhat longer. During World War II, the construction time for warships was dramatically reduced through the concerted efforts of both the Navy and the industries involved. The Navy, working with the War Production Board, instituted standardization of warship designs, central procurement of ships' major equipment, propulsion machinery, and ordnance, and allocation of key materials. Industry went to twenty-four hour workdays with multiple shifts, prefabrication and automation of many processes, and multiple other time saving methodologies. The Navy and the U.S. Maritime Commission worked closely with the shipbuilding industries and increased the number of shipyards capable of constructing destroyers and larger ships from approximately a dozen in 1940 to around 70 in about two years.

**Asbestos and Insulation in the Navy**

34. As described above, the Navy requirements for aircraft carriers and other warships of World War II and later included the need for significantly higher speeds than previously. This reqired high speed was achieved by the design and development of sophisticated high-pressure steam propulsion systems. Steam pressures of 600 pounds per square inch and the ability to superheat the steam to 850° F became the norm.

35. The key to meeting this high horsepower demand was the development by the Navy of much higher pressure, superheated steam propulsion plants. With the increased

pressures came greatly increased temperatures and thus the need for much improved insulation technologies, both for plant efficiency and for operator comfort and safety. These "high power density" propulsion plants increased the operating temperatures of machinery and piping, and they created a need for greatly improved thermal insulating and lagging materials. The Navy maintained significant expertise in the important areas of heat transfer and insulation. As a consequence, the thermal insulation needs associated with various equipment and systems was a significant issue in the design of Navy vessels from a number of perspectives. Thermal insulation served a number of important functions, as set forth, for example, by the 1947 version of the Navy's BUSHIPS Manual, a technical reference for Navy engineers, where Chapter 39 was devoted entirely to "Thermal Insulation":

> 39-2. REASONS FOR INSULATING
>
> (1) In every power plant there is a heat loss from all heated surfaces and a heat flow to all cooled surfaces. Heat flow may occur in three ways; by conduction, by convection, and by radiation.
>
> (2) Conduction is the heat flow from one part of a body to another part of the same body, or from one body to another with which it is in physical contact, without displacement of the particles of the body. This manner of heat flow is most important in insulation as it is the low conduction which results in the greatest temperature differential between a hot insulated surface and the atmosphere (as in steam piping insulation), or the relatively warm atmosphere and a cold surface (as in refrigerating plant insulation). Heat transfer from insulated pipes or large blanketed or cemented surfaces (turbines, evaporators, etc.) to the outer surface of their lagging is included in this mode. Conduction is associated with solids and comparison of materials in this respect is measured by a factor called the "thermal conductivity" which expresses rate of conductivity in British thermal units (B.t.u.) per inch of thickness per hour per square foot of area per degree Fahrenheit temperature differential.
>
> (3) Convection is the transfer of heat from one point to another within a fluid, gas or liquid, by circulating or mixing of one portion of the fluid with another. These currents are produced by warm fluid being displaced by heavier cold fluid. It is of interest to note that convection reduces the effectiveness of air

space insulation unless such space is very small.

(4) Radiation is the method of heat transfer by which a hot body gives off energy in the form of radiant heat which is emitted in all directions. Radiant heat, like light, travels in straight lines and with the speed of light. The surface condition greatly affects the ability of a body to radiate heat. Dull, dark, rough finished surfaces are the best radiators. Conversely, bright, shiny, smooth surfaces are good heat reflectors.

(5) In order to minimize the transfer of heat from or to a body or surface which is hotter or colder, respectively, than the surrounding atmosphere, thermal insulation is applied. This thermal insulation is a material or materials of low thermal conductivity. (See par. 39-2 (2).) While increasing the economy of the plant, thermal insulation also reduces the quantity of air necessary for ventilating and cooling requirements and prevents injury of personnel due to burns from contact with hot parts of apparatus. It also insures more uniform heat distribution within equipment. Another function of thermal insulation is to prevent "sweating" of cold surfaces on which atmospheric moisture condenses thus causing undesirable dripping as well as accelerated corrosion of the metal. Insulation must be sufficiently effective to reduce heat losses and lower surface temperatures to a degree which will permit habitable conditions in a specific space or compartment.

(Exhibit C, 39-2).

36. Due to the importance of heat transfer and insulation in Navy propulsion plants and aboard Navy vessels more generally, the Navy maintained significant expertise in these areas. The BUSHIPS manual and other documents issued and continuously updated by the Navy contained detailed instructions for the insulation by Navy shipyards or private contractors of various systems and equipment, including, primarily, the miles of piping associated with thermal systems aboard vessels. The Navy's specifications provided detailed instructions as to the specific insulating materials to be used, and also as to the amounts of those materials and the manner in which they were to be applied.

37. A 1946 article entitled "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels" summarized the extent of and reasons for the Navy's use of asbestos-containing insulation during World War II:

> The chief reasons for the wide use of amosite felt and pipe covering in naval work are its low thermal conductivity, light weight, strength, and refractoriness. When the felt and pipe cover were first developed, we were still building vessels under the Washington Treaty of Limitations
> in Tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of more economic operation for the weight involved in insulation.
>
> Amosite pipe covering weighs about 14 pounds per cubic foot, with a temperature limit of 750 degrees F. as compared to magnesia with a weight of 16 pounds per cubic foot[. . . .]
>
> The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used in destroyer turbines. . . . Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges, etc. From the initial destroyer, it has been used on almost all the destroyers built since that time and on all other combat vessels built since before the War.
>
> Pipe covering was a later development in late 1935 and early 1936. Due to the manufacturing problems involved, it took a longer time to evolve into a satisfactory shape, and its first use on naval vessels was in 1937. Since that time its use has spread markedly and it was used on the great majority of naval combat vessels built during World War II.

(Exhibit D, p. 9).

38. The Navy's dictation of the methods and materials for insulation of thermal systems took various forms. As noted above, these included serial iterations of the BUSHIPS Manual's Chapter 39 on "Thermal Insulation." See Exhibits C (1947) and E (1960). The Navy also prepared and imposed upon Navy design engineers General Specifications for Machinery for Vessels of the United States Navy. Those specifications included an entire section – Section S39 – governing "Thermal Insulation for Machinery and Piping." The 1951 version of this document is attached as Exhibit F. Beginning in 1962, the Navy began issuing a Military Standard intended "to amplify the general requirements for insulation of piping, machinery, uptakes, and mechanical equipment

covered in the General Specifications for Ships of the U.S. Navy or in ships specifications. (Exhibit G).

39. The Navy and/or its design agents prepared for the builders of Navy vessels detailed drawings and plans showing the precise methods and materials for insulation of various systems and equipment. Those documents – referred to as "Insulation and Lagging Schedules" – implemented the overall requirements of the General Specifications, and they provided the actual instructions to the personnel applying insulation as part of an integrated system of temperature control and energy conservation consistent with the Navy's needs in the operation of its vessels. These "Insulation and Lagging Schedules" were typically developed for each class of warship. Examples of such plans for the *USS Fletcher* and *USS Sumner/Gearing* class destroyers and the *USS Essex* class aircraft carriers are attached as Exhibits H, I and J. The Insulation and Lagging Schedules included details on the materials to be used, the thickness, installation procedures, and finishing details for tens or even hundreds of tons of thermal insulation materials to be applied by Navy and private shipyards. Once the Navy selected a construction shipyard, that shipyard was required to comply strictly with all Navy specifications, plans and drawings in the application of insulation and lagging to systems and equipment aboard Navy vessels.

40. As the attached documents demonstrate, throughout the World War II and post- World War II era, the vast majority of thermal insulating materials used aboard Navy vessels contained asbestos. Asbestos-containing materials offered many advantages over previous or alternative materials in meeting these needs. They were relatively light compared with previous materials, had better insuating properties, did not

require excessive thicknesses in application, were more durable and were resistant to dissolving in or absorbing salt water. The materials also served as fire protection in an environment in which fires were an ever-present danger.

41. Thus, the use of asbestos in thermal insulation allowed the Navy to design and field propulsion systems that met the demanding war fighting requirements of World War II and later. The importance of asbestos to Navy warships is attested to by the fact that it was assigned a high priority in the U.S. government's critical materials allocation process. Asbestos was in short supply during World War II, and its use was controlled through the War Production Board process. A very large percentage of asbestos was allocated to the needs of the Navy and U.S. Maritime Commission for use in insulation for ship construction.

42. The Navy's demands for asbestos-containing insulation were extraordinary. For example, the Insulation and Lagging schedules for destroyers of the Navy's *Sumner* and *Gearing* classes – relatively small vessels of which the Navy constructed approximately 200 during World War II – specified nearly 24 tons of asbestos containing thermal insulation be installed. A 1979 Department of the Navy letter (Exhibit K) recites the following estimates of the quantities of thermal insulation aboard different types of Navy vessels of the 1950s and 1960s:

| | |
|---|---|
| Destroyer - DD | 87,634 lbs |
| Guided Missile Cruiser - CGN | 123,770 lbs |
| Submarine – SSN | 62,465 lbs |
| Replenishment Oiler – AOR | 78,515 lbs |
| Large Harbor Tug – YTB | 6,858 lbs |

Larger vessels, such as aircraft carriers and battleships – required multiples of those amounts. Taken as a whole, in both new construction and overhaul, the Navy applied

thousands of tons of asbestos materials aboard its vessels from the 1930s through the 1970s.

43. Due to the complexities of the ship design and construction process, and the global nature of the Navy's approach to selection and procurement of insulation and lagging materials, manufactuers of components such Buffalo Pumps were not consulted by the Navy with respect to insulation of their equipment. Moreover, they had no control over the types and quantities of insulation products to be used in conjunction with their equipment, nor could they even be certain whether or not any insulation would, in fact, be applied to their equipment due to the variety of circumstances and potential uses of the original equipment once aboard a Navy vessel.

44. Above and beyond the tens or hundreds of tons of thermal insulation used, other asbestos materials were ubiquitous aboard Navy vessels. These materials included electrical insulating materials, flooring, refractories and sealing materials.

**Written Materials Regarding Equipment Supplied to the Navy**

45. Technical specifications referenced in the procurement documents for components such as pumps have, since at least the 1940s, included detailed requirements regarding all written materials supplied with pumps. Manufacturerers were required to supply drawings and plans, as well as technical manuals for equipment. The applicable specifications included strict instructions regardng the labeling of and packaging of the components themselves, and for all technical documentation that was procured with them. Examples of MILSPECs for pumps during this period are attached as Exhibits A and B.

46. The Navy had precise specifications as to the nature of any markings,

communications or directions affixed to or made a part of any equipment supplied by manufacturers such as Buffalo Pumps for ultimate use aboard Navy ships. Such manufacturers would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation in a Navy ship, beyond those specifically required by the Navy without prior discussion and expressed approval by the Navy.

47. The Navy also had precise specifications as to the nature of written materials to be delivered with equipment supplied to the Navy, which included engineering reference materials to assist the naval operators and maintanence personnel in servicing and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses. These written materials are and were generically known as "instruction books" or "technical manuals." Through specifications, the Navy required that certain equipment be supplied with a defined number of copies of one or more instruction books or technical manuals.

48. Navy personnel participated intimately in the preparation and review of these instruction books and technical manuals in a standardized format used by the Navy. These manuals included safety information to the extent – and only to the extent – directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy

without prior discussion and approval by the Navy. The Navy dictated, reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis. The Navy approached this process for review and approval of technical manuals in an exacting manner. It often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings. Examples of such correspondence are attached as Exhibit L.

49. The reasons for the Navy's detailed control over and review and approval of all written communication regarding equipment it procured was to ensure consistency of that information with the overall goals and priorities of the Navy in its operations. The Navy employed millions of uniformed and civilian personnel aboard thousands of vessels and at hundreds of land-based facilities around the world. The information provided with regard to equipment had to be consistent with the Navy's overall evaluation of the appropriate types and level of information its personnel required to efficiently perform their job responsibilities under a variety of circumstances. In addition, written communications regarding work practices, including safety precautions and equipment, had to be coordinated with the training of Navy personnel, the physical circumstances in which they performed their work, and the tools, protective devices and equipment and other materials available aboard Navy vessels and at Navy installations.

50. Based upon my knowledge of and experience in the design, inspection and procurement of components for use on Navy vessels, the Navy would not have permitted Buffalo Pumps or other equipment manufactuers to place asbestos-related warnings in technical manuals supplied with pumps for Navy ships during the 1940s, 1950s and

1960s.

**Navy Organization**

51. Consistent with the sweeping scope of its mission and responsibilities, the Navy is comprised of many different organizations, each of which is specialized in focus, talent and experience. These organizations work together in accomplishing the very complex and unique sequential efforts from the defining of naval war fighting requirements, to designing ships and weapon systems that will meet these requirements, and then contracting with industry and other government agencies to procure the vast array of required equipment and materials and to construct and test warships. This diverse Navy organization can be described in four major groupings:

-- Secretary of the Navy (SECNAV) and the Chief of Naval Operations (CNO) headquarters staffs (CNO staff is referred to as OPNAV)
-- Operational Fleets
-- Technical Bureaus (now called Systems Commands)
-- Staff Corps (Medical, Dental, Legal, etc.)

SECNAV and CNO Staffs

52. The staffs of Secretary of the Navy (SECNAV) and the Chief of Naval Operations (CNO) are involved in the analysis of national naval war fighting needs, and the development of specific war fighting requirements that must be met. At a top level for warships, these requirements include such things as the types and numbers of ships needed; the capabilities for these ships such as speed, weapons to be installed; types and numbers of aircraft to be embarked; the range and duration at which these ships must be able to operate independently at sea without replenishment; and the reliability of systems that must be guaranteed in order for the Navy to meets its war fighting mission. These staffs are manned by a combination of experienced uniformed Navy personnel with

extensive Fleet experience and career civil servants.

Operational Fleets

53. The Operational Fleets are the Navy's war fighters who control and operate the various ships, aircraft, and other equipment in the Navy and Marine Corps. There are several numbered Fleets (*e.g.*, Sixth Fleet, Seventh Fleet) with regional geographic responsibilities around the world. These Operational Fleets have always worked closely with the headquarters staffs in the development of naval warship required capabilities.

Technical Bureaus

54. The Bureau System was established in 1842 to provide the Navy with necessary technical and management control. By the early 1940s, there were six bureaus:

-- Bureau of Naval Yards and Docks
-- Bureau of Ships (BUSHIPS)
-- Bureau of Supplies and Accounts (BUSANDA)
-- Bureau of Ordnance and Hydrography
-- Bureau of Medicine and Surgery
-- Bureau of Aeronautics

In the 1950s, a Bureau of Weapons (BUWEPS) was formed by merging the Bureau of Ordnance and the Bureau of Aeronautics. In the 1960s the bureau system evolved into what are now called the Systems Commands where BUWEPS became the Naval Air Systems Command, BUSHIPS became the Naval Sea Systems Command (NAVSEA), and BUSANDA became the Naval Supply Systems Command.

Navy Staff Corps

55. The various staff corps of the Navy are comprised of professionals such as doctors, dentists, and lawyers who support all aspects of the Navy in their respective specialties.

56. The Bureau of Medicine (BUMED) has always had a very significant role in

both the design and operation of Navy warships, in addition to its fundamental role in the overall health and well-being of Navy personnel. All ships have medical facilities integrated into the design, both for normal medical support of the large crews, and for treatment of battle injuries. Small ships such as destroyers have a modest infirmary space and other spaces that can be converted for medical use while at battle stations. Larger ships have much greater medical capability, with aircraft carriers being fully equipped with several operating rooms for surgery and large hospital wards for sick and wounded personnel.

57. BUMED also plays a very significant role in the operation of Navy ships. BUMED establishes the medical policies and procedures, both preventive and curative, which are utilized on all Navy warships. Additionally, the crew of each warship includes medical personnel who are involved in preventive medicine, crew training, health inspections, and treatment of ailments and injuries. Small ships such as destroyers typically have one highly trained enlisted hospital corpsman assigned, and large ships have both physicians and hospital corpsmen. Aircraft carriers have numerous medical doctors and surgeons with various specialties.

**Responsibilities in Warship Design and Construction**

58. Responsibilities for the various functions associated with warship design and construction in from the World War II period to the 1970s were as follows:

<u>SECNAV and OPNAV Staffs</u>

59. Working closely with the Operational Fleets and Bureaus, these staffs had the responsibility for defining naval war fighting requirements, developing concepts of operations and ship concepts, and requesting congressional authority and funding to build

war ships.

BUSHIPS

60. The Bureau of Ships was comprised of a broad assortment of engineers and technical personnel, and was responsible for all technical aspects of Navy warships. Included were the preliminary designs of ships, the detailed design of equipment and subsystems, and development of the contract design package. BUSHIPS, aided by BUSANDA, had the responsibility to develop the contract design package and the myriad invitation for bids required to actually procure and construct the ships. All U.S. Naval Shipyards were under the direct command of BUSHIPS, as were the resident Supervisors of Shipbuilding who performed the same government supervisory functions at civilian shipyards. Thus, BUSHIPS was responsible for both the new construction and future repair and overhaul of ships at both naval and private shipyards. BUSHIPS and BUSANDA each had on-site Navy inspectors at various vendors' plants that were responsible for verifying that the vendor complied exactly with all provisions of that vendor's procurement contracts. BUSHIPS was also responsible for the design and development of equipment repair and maintenance standards and procedures, and for the development of Navy Specs/MILSPECs that related to ships and ship equipment.

BUSANDA

61. The Bureau of Supplies and Accounts was comprised of a variety of professionals with specialties in areas such as government contracting, logistics planning, financial and business management, warehousing and parts distribution management, etc. BUSANDA, in addition to on-site and continuous support of BUSHIPS and other technical bureaus, also provided all Supply Corps officers to the Operational Fleet. The

Supply Corps officers were assigned to both ships and Fleet staffs and were responsible for planning and managing all shipboard messing, berthing and spare parts management. BUSANDA was responsible for maintaining and managing the vast inventory of spare parts, consumables, documentation, and replacement equipment for the Navy.

David P. Sargent, Jr.

Sworn to and subscribed
before me this 5 th day
of March, 2008.

NOTARY PUBLIC
EVELYN B. STARKEY

MY COMMISSION EXPIRES: 12/29/2010